UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                      CASE NO. 18-CR-20104-MGC

UNITED STATES OF AMERICA,
                                        Miami, Florida

                                        March 29, 2019
            vs.

ALI NASREDDINE KASSIR,

                    Defendant(s).      Pages 1 - 30
------------------------------------------------------------

                       SENTENCING HEARING
            BEFORE THE HONORABLE MARCIA G. COOKE
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:     MICHAEL THAKUR, AUSA
                        United States Attorney's Office
                        99 N.E. 4th Street
                        Miami, Florida 33132
                        michael.thakur@usdoj.gov


FOR THE DEFENDANT(S):   JEFFREY S. WEINER
                        ANNABELLE NAHRA
                        DIEGO WEINER
                        Jeffrey S. Weiner, P.A.
                        9130 S. Dadeland Boulevard
                        Suite 1910
                        Miami, Florida 33156
                        lawfirm@jeffweiner.com
                        annabelle@jeffweiner.com
                        diego@jeffweiner.com


REPORTED BY:            Jill M. Felicetti, RPR, CRR, CSR
                        Official Court Reporter
                        400 N. Miami Avenue, Suite 08S27
                        Miami, Florida 33128
                        jill_felicetti@flsd.uscourts.gov

(Case called to order of the court at 3:06 p.m.)

THE COURT:  United States v. Ali Kassir.

For the record, appearing on behalf of the United States.

MR. THAKUR:  Michael Thakur on behalf of the United States.

THE COURT:  Appearing on behalf of Mr. Kassir.

MR. WEINER:  Good afternoon, your Honor.  Jeff Weiner, Annabelle Nahra, and Diego Weiner all on behalf of the defendant, Ali Kassir, who is present.

THE COURT:  Today is the date and time set for sentencing in this matter.

Counsel, I know there were a couple of resolved issues in terms of the guideline calculation.  One of them particularly went to what, I guess would be best to say, double counting on the money laundering issue.

Do you care to speak to that?

MS. NAHRA:  Yes, your Honor.  As we laid out in our response, when you first begin the calculation for Mr. Kassir's guidelines, we start with 2S1.1, which is the appropriate guideline for a sentence under 18, U.S.C. 1956.  That guideline necessitates the need to find a base offense level, and because the underlying offense was the unlicensed money transmitting, that base offense level takes you to 2S1.3, but then you must return back to 2S1.1 to look at the specific enhancements under

money laundering.

Mr. Kassir is already being enhanced two points for the conviction under 1956 plus an additional two points for the sophisticated laundering.

The enhancement under 2S1.3 simply doesn't apply, your Honor, and it is absolutely double counting. Under that enhancement it seeks to punish an individual who is not only an unlicensed money transmitter but is also a money launderer.

I am sure your Honor can imagine a circumstance in which, perhaps, an individual is sending money over to Cuba, for example, acting like a bank, acting like an unlicensed money transmitter, but the source of the money is legitimate.

Now, if it turns out that the source of money is not legitimate, that two-level enhancement applies under 2S1.3 to punish the individual acting as an unlicensed money transmitter and also a money launderer.

THE COURT: You are saying once you start, at Paragraph 67, with the 2S1.1(b)(2)(B) enhancement of two levels, that you really are duplicative when you go to 2S1.1(b)(3)?

MS. NAHRA: Absolutely. The reason Mr. Kassir pled guilty to money laundering was the acknowledgment that the proceeds were, of course, illegal. So he is already being punished with that two-level enhancement under the 18, U.S.C. 1956.

Now, Probation is seeking to double enhance with another two points for exactly the same conduct that is implicit in the original charge.

The case that we cited to you, the case of Bourne, specifically refers to a bank robber who, first of all, was enhanced three levels for brandishing a weapon, and then was also enhanced for two levels for making a threat.  The court in that instance found that by brandishing a deadly weapon you are implicitly making a threat.  So it's double counting.

In this case, Mr. Kassir has pled guilty to money laundering.  The acknowledgment that the proceeds were illegal, he is being given a two-level enhancement for that.  For him to now also be given a second two-level enhancement for exactly the same charge, it's implicit within the argument.

There is absolutely no case law on this whatsoever. Of all the cases we looked through, we couldn't find a single example where it had applied.  And even reaching out to the United States Sentencing Commission, they couldn't give us any direction in which they had ever seen a case where this has applied.

It's our position, and it's also the government's position, that in this specific instance it shouldn't be applied because he's already being punished for the underlying offense of knowing that the proceeds were illegal.

THE COURT:  Mr. Thakur, do you agree with counsel for

the defense?

MR. THAKUR: We are in agreement. I couldn't find any case law, either, on it, either within the guidelines providing any guidance on it or any case law in which it was either applied for not applied.

Usually the guidelines will specifically say, for instance, in the access device fraud context, if it's just a 1029 access device fraud and you are also charged with aggravated identity theft, you don't give the enhancement for means of identification because that's already included within the 1028A.

I thought it persuasive. It's somewhat analogous here. If you charge someone with money laundering, you have to show that they knew that the underlying funds were from an unlawful source, and that seems to be what they also attribute for 2S1.3.

So out of an abundance of caution, to avoid any double counting, we agree that it shouldn't apply.

THE COURT: I am certain there's probably going to be a case in the future where I would find that this is an appropriate step to take in terms of the guideline calculation. I don't find that this is the case.

So at this time I am directing the probation officer to delete what I think is Paragraph 68 of the guideline calculation, and if I have done this correctly, it now means

that we would be at a level 26 instead of a level 28.

PROBATION OFFICER:  Your Honor, I think the enhancement that counsel is objecting to is in the bottom of Paragraph 66, the 2S1.3(b)(1)(A) enhancement.

THE COURT:  Yes, I misspoke.  So therefore what does it become, a level 22?  And we still have the 18, U.S.C. enhancement at Paragraph 67, correct?

PROBATION OFFICER:  Sixty-seven and 68 would apply as well as 70.  After acceptance his total offense level would be a level 26.

THE COURT:  So we are now dealing with an offense level of 26, which would mean a guideline range of 63 to 78 months?

MS. NAHRA:  Yes, your Honor.

THE COURT:  Any other guideline calculations that the court needs to make before I proceed to a discussion of 3553 factors?

MR. WEINER:  Your Honor, there is a matter that I think should be addressed very briefly at sidebar, if you will please permit us.

THE COURT:  Approach, please.

(SEALED PORTION OF TRANSCRIPT REDACTED)

THE COURT:  Anything further from the defense?

MS. NAHRA:  Yes, your Honor.  If I could approach the podium?

THE COURT:  Yes.

MS. NAHRA:  We are going to separate the argument, your Honor, and Mr, Weiner will be concluding.

Your Honor, this case for me personally has been a difficult one.  When Ali and Nadine came into my office, they are the same age as me.  They grew up in South Lebanon, which is an area that I am from.  They are educated.  They come from good families.  They have got great backgrounds.  They are actually the kind of people I could imagine being friends with and being part of my social group.

When Mr. Kassir first came into our office, I didn't really understand what he was doing there, what this case was really about.

Given his background, personally I can relate to how difficult it can be to come to this country with the last name like Nahra or like Kassir or a first name like Ali in a post-911 world and figure out a way to navigate that and be successful.

One of the things that struck me about Ali was his ability to be successful.  He created and started a small online company on Craigslist to a company that, within the past eight to nine years, had almost $230 million in sales.

This was the company that, based on his reputation and his honest and his hardworking nature, he was able to persuade individuals and distributors, like Sony, to give him exclusive

distribution rights to distribute their products --
PlayStations, Game Boys, consoles -- and that was the majority
of his business. 99.3 percent of his business, as we laid out
in your exhibits and our motion, were purchases from U.S.
distributors. All of those products come with invoices, serial
numbers, all U.S. based, and then shipped over to Paraguay and
Uruguay. The percentage of his business that involved the
accessories, which is part of the basis of this case, is only
0.51 percent. It is a tiny amount of his business.

It was a part of his business that Ali had never
wanted to get involved in. He was never interested in
accessories. He was very successful doing the business with
U.S. distributors.

But along the lines, when he was doing business in
Paraguay, he met Mohamad Jebai, who is the owner of Modi
International, his second biggest client in Paraguay. They
weren't just business friends and colleagues; they were
friends. They developed a really close familial relationship
where they trusted each other immensely. They trusted each
other to the point that Mohamad was able to buy product from
Ali on credit. Millions of dollars of credit was extended to
him at any given time. And it was Mohamad who suggested to Ali
to get into the accessories business, that you could make great
margins on the accessories business.

Mohamad told him I have a brother, Samer, who lives in

Hong Kong.  He is not doing well financially, I want to do what I can to try and help him, and this accessories business could really help me.

Ali, and the family and friends who know him, will tell you that he is the kind of guy who is going to look to try to make somebody happy.  This was a very important client to him, a client that was asking him to get into this business.  So he agreed.

Samer, who was living in Hong Kong, showed him a video of the device that they run the batteries through and the accessories through to convince him that these products were legitimate.  And at the beginning, your Honor, he believed that they were, but of course there came a point at which he realized they were not, and he continued to be involved in the conspiracy.

He 100 pled guilty to and acknowledges his responsibility, and it was an incredible lack of judgment on his part to be involved in this, but as he became involved and the sales grew with Mohamad, the amount of credit being extended to Mohamad grew.  Of course Mohamad wanted additional goods to be brought in.

The first two sets of goods, your Honor, as your Honor can see from the factual proffer, when they came in and CBP said they were counterfeit, Ali hired a lawyer to challenge him.  Mr. Kassir challenged them because at that time he did

not believe they were counterfeit, and of course later on that changed.

As is laid out in the PSR, to some extent the government's position is that between Ali -- between Mr. Kassir and Mohamad Jebai there were a number of invoices between them where the internal invoice was different to the commercial invoice that was submitted to the Paraguayan authorities for import duties.

Myself and Mr. Diego Weiner actually visited Paraguay. We spent a number of days there. We met with Mr. Jebai, the owner of Modi International, at length. We met with his brother, who flew in from Hong Kong to meet with us. We met with a number of other business owners. We met with the despachantes who are the individuals who handle the import/export duties, and I heard them, with my own ears, tell me, oh, the commercial invoices, we don't care what they say; we decide what the value is based on the unit.

There is, of course, no question that those commercial invoices were sometimes devalued. It's been our position from the beginning, as we laid out in our memorandum, they were devalued to confuse the competition. They wanted to be able to undercut their competition and get those amounts for cheaper, and when they devalued the invoices, a lot of their competitors would see that and think there is no way that I could compete to sell that product at that amount, and they just wouldn't buy

it.

But of course there were instances in which I am sure Mr. Jebai was able to benefit from paying less import duties. There were also a number of instances in which those commercial invoices were actually higher which would have necessitated Mr. Jebai to pay more money.  At the end of the day, the difference that we are talking about, your Honor, is $1.8 million.

Now, of that difference we submitted additional invoices that show that actually $550,000 were invoices in which the amounts were actually higher, where the commercial invoice was higher than the actual invoice between the two of them, where Mr. Jebai would have likely paid more in the import duties.

At the end of the day, both the accessories and the invoices account for a tiny percentage of Mr. Kassir's legitimate business, a minute amount of 0.51 percent of a legitimate business of almost $230 million.

There is no question, your Honor, that he exercised incredibly poor judgment in continuing to involve in this business with Mr. Jebai.  He felt beholden to him because of the relationship that they had, but also because of the amount of money that was outstanding.

At any given time Mr. Jebai owed Mr. Kassir thousands of dollars in profit and in goods that were being bought on

credit, on 30 days of credit, on 60 days of credit, and there came a point at which Ali felt a though he couldn't pull himself out of that company without losing a substantial amount of money. But it does not excuse the fact that he was involved in this, and that's why he pled guilty to it, but it was at a time in which he lacked very poor judgment, but that is not who Mr. Kassir is.

I am sure that your Honor has reviewed the character letters. The character letters speak volumes about who he really is as a person, what he means to his wife, to his son, to a wife who, by her own admission, will say that her son is even more attached to his dad than he is to her, what he means to his cousin, Jamal, who he saved from drowning two years ago when they were in the ocean together. Jamal said to him, "I can't swim anymore, you should go back, leave me here." Mr. Kassir said, "I won't leave you, we will either drown together or we will make it out together." That's who he is as a person, that's who he means to the people in his life.

The judgment that he has had throughout his life is a person who is dedicated to his family, dedicated to his job, dedicated to building this American dream for himself, and from the bad decisions that he made towards the end has all come crashing down around him.

But when you look at the totality of the circumstances, the legitimacy of his business, the small

portion that these modified invoices and counterfeit goods really played a part in this, we hope that your Honor is persuaded to see that it was a small part of his life and a small part of his business in which he made these very bad decisions.

I am going to turn to Mr. Weiner to allow him to make some conclusory remarks, unless your Honor has questions.

THE COURT:  Thank you, Ms. Nahra.

Mr. Weiner.

MR. WEINER:  Your Honor, I know it's Friday afternoon, and I will be brief; however, this is a big responsibility, as you know, for not only a judge and the prosecutor, but, really, for the defense.

For all the years you have been on the bench, Judge, I find that some judges, not your Honor but some judges, look at things very mechanically, and it's a question of numbers and sentencing guidelines.  We have a different situation here, and I want to tell you some things that are not in the PSI.

Judge, you have before you a gentleman who was living in Lebanon.  Things got very violent and rough there.  So after he graduated high school at 16 years old, he then traveled to the United States by himself.  He told his father I need to get out of here.  He learned basic English and decided to come to the United States.  He had nobody here other than the fact that the family knew somebody who was a distant relative in

Michigan.

Ali Kassir, barely 17 years old, flew from Lebanon to Michigan, entered legally, and was able to stay with these people for about a year.  He immediately went to school.  He went to a community college.  He then went to -- he went to Oakland Community College.  He then transferred to Henry Ford Community College, went back to Oakland Community College, and ended up at the University of Michigan, where he got a Bachelor of Science degree in software engineering.  He then went back to school and got a master's degree.

Some of the details are unimportant, but what is important, your Honor, is that Ali Kassir at a point went to the Ivory Coast to try to make money.  He left from the United States.  He saw poverty, he saw harshness, he saw a life he didn't want to be a part of.

He came back to the United States and began working for NASA, not the government but NASA Electronics.  I won't bore you with what's beautifully written in the PSI, but the bottom line is that is where Ali Kassir learned about the electronics business, that's where he learned about Paraguay, and that's where he got visited, or his company got visited by the FBI.

Ali Kassir, as an employee back then of NASA, cooperated with the FBI agents.  They wanted information about the owner of that business who had left the United States.  And

Ali Kassir was a young man, he was an employee, he cooperated.

He then left. He wanted to be away from NASA when he knew what was going, and he formed the business.

Ms. Nahra told you briefly, but, Judge, this young man with a master's degree in business and nothing else -- nothing -- convinced Sony Electronics, convinced Microsoft, convinced Proctor & Gamble to trust him and make him their exclusive distributor of PlayStations, of the Xboxes to go to Paraguay.

As Ms. Nahra said, in Paraguay people from numerous countries in Latin America come to this one giant area where there's literally hundreds of shops, some big, some small small, all selling electronics, everything was legit. Everything had serial numbers, everything was proper.

And as Ali's wife, who is present here today, says she is upset when the man in Paraguay, who is Ali Kassir's biggest customer to the tune of millions of dollars, started asking him favors and to do things that Ali Kassir didn't need to do, didn't want to do, but ultimately in a failure of judgment, a failure of maturity, a failure to think about what's important in life got involved with these cell phone accessories, earphones, batteries, plug-in chargers, things of that nature, that, as your Honor now knows, constituted less than 1 percent of his business but now has him before this court as a convicted felon with potential problems with immigration.

His life has gone from doing millions of dollars of business to his daily life now selling shampoos, like cosmetics.  And what he does is he goes to beauty salons, and he basically hawks his products.  He puts on beauty shows where famous haircutters come in and use the products to try to generate orders.  This is a man who really wants to succeed in life and who has succeeded beyond his wildest dreams.

He now is done with Sony, he's done with Microsoft, he's done with Proctor & Gamble.  He has, as a convicted felon, no more business with these companies, no more lines of credit.  Where he used to enjoy 6 to 8 million lines of credit, he now has nothing.  He now sells shampoos to make money.

Your Honor, I want, very briefly, to let you know that the family support for Ali Kassir is spectacular.  We have come to know this family.

So I want to first mention very briefly Dr. Nasreddine Kassir.  He is 70 years old.  He's a gynecologist.  He lives in Lebanon.  He is a gentleman.  He is a Freemason.  He is here to support his son, and I thank you so much for coming.

AUDIENCE SPEAKER:  Good afternoon, your Honor.

THE COURT:  Good afternoon, sir.

MR. WEINER:  The defendant's wife, Nadine, is present in court.  A lovelier woman doesn't exist.  She's got her Ph.D. from FIU and is a professor at University of Miami.  She teaches nutrition sciences to medical students, to all sorts of

people that want these graduate classes.

However, interestingly and relevant beyond her qualifications is the fact that, as you know, the defendant and his wife have a two-year-old son.  The classes that the defendant's wife teaches are at night.  They are graduate classes.  So she is at the University of Miami until her classes end at 8:00 o'clock, not every night but several nights a week, and by the time she meets with students and gets home, it's late.

Of course the defendant should have thought about all of this, but the fact of the matter is the defendant is the caregiver to their two-year-old son.  That's how it is.  And I think that's an important fact to keep in mind.

In addition, very briefly, your Honor, the defendant's older sister is present.  She came in from Canada.  She has a Ph.D. in pharmaceutical sciences.  She is a fellow for the American Society of Clinical Pharmacology.  She's married. She's great.  She is here on behalf of her brother as well.

We also have Mira Mikati here, who is the defendant's wife's older sister.  She's got a bachelor's degree in English from the University of Michigan, and she is here to support the defendant, as is his younger brother, who you heard about with the potential drowning incident.  He's a dental student at Nova.  So thank you, all, for being here.

Your Honor, I was on a cruise recently and met up with

a retired federal judge.  During our conversations, as we talked about his career, I asked him if he had any regrets at all, and the comment that he said really rang a bell with me. And that was he started out as a judge when there were no guidelines.  The guidelines came along, and he told me that he went along with the guidelines for years, as a federal judge had to do.  He said that his regret was some of the sentences that he handed out that he now acknowledges and realizes that were much too harsh.

The Supreme Court now has, of course, allowed judges, federal judges appointed by the President of the United States with the support of Congress, to have discretion to use your judgment.

Judge, it costs $80 billion a year to incarcerate persons in the United States.  I won't bore with you these statistics of how many people we have in custody.  Violent criminals, absolutely.  Child molesters, absolutely.

We have a man here who has no prior criminal history, who is as kind and polite as any human could be, who's got incredible family support, who came here as a kid, who loves this country, and did everything right.  And from what you heard at some sidebar, he is doing everything to make things right with the United States, with his life, with his family, with his child.

Your Honor, we have appeared before you many times

through the years, and I don't recall ever asking for a sentence that did not include incarceration. We try to, as lawyers, maintain whatever credibility we might have by being realistic in what we ask the court to do, but on the other hand, after 45 years of doing this, sometimes I walk out of court and go I am playing the same game as the judges who give guideline sentences or a little below and say, gee, I am really sorry, my hands are tied.

But, no, the hands are not tied. Judge, you are as fair as a judge could be, and I know you know this case. You know what we have gone through from early on in this case. You know the work that has gone into it to try to put the case in its proper context.

I want to say that Michael Thakur has been an absolute gentleman and a treat and a pleasure to work with, and the various FBI agents sitting in the back of the courtroom, the same way. They have been fair, they have been honorable, they have been great.

So a case that started out as something that we were very concerned about, and the court knows about it, to have a prestigious, high-ranking prosecutor like Mike Thakur on the case has turned out to be, basically, a case involving less than 1 percent of our client's business for counterfeiting cell phone accessories.

Considering everything, and the fact that our client

has no prior criminal history, what purpose would be served putting him in custody?  What message would be sent?  Costing the taxpayers money for a nonviolent first-time offender who has admitted his guilt, who has seen the light, who is an honorable man with amazing family support?

This is a man who, if he is given a chance to be on house arrest followed by supervised release, he will never be back before this court again.  He can do community service, he can talk to people, he can explain how the pressures to succeed in business should never override the judgment.  The family responsibility, the loss of reputation.  He's a convicted felon now.  It's all over for him.  His great income that he had, he's got nothing.  He's selling shampoos now and working hard to do it to support his family.

So, Judge, if you give him a sentence of incarceration, nobody would criticize you because we are in federal court.  Honestly, I truly believe that if you had a chance to really know our client and to really know the case beyond what you know -- and you know it -- but your humanity would kick in, and I am sure you would say what is the point?  When do we stop incarcerating people that don't need it?

His punishment has already happened and will forever and ever, as he's going to fight to stay in this country and to be here with his wife because she is not going back to Lebanon.  His son is a U.S. citizen.  He is a U.S. citizen.  He's got a

nightmare ahead of him, under the best circumstances.

So considering everything we ask you to do something special, but, to me, it should be something that's in the mix, and that is don't incarcerate him.  If he needs to be in a halfway house for six months, fine.  Let it be followed by home confinement.  And I am not just saying that hoping that your Honor will say, all right, let me see where the guidelines are and let me come down a percentage.  Some judges just do percentages.  You don't.  And thank God that you don't.

So, Judge, we know you will be fair, we know you do what you think is the right thing, but this man does not need to be incarcerated.  And I thank you very much.

THE COURT:  Thank you very much.

Counsel for the United States, do you have any suggestions for the court in terms of the guideline range here?

MR. THAKUR:  Your Honor, based on our motion that we discussed at sidebar, we are recommending 47 months.  That takes into consideration both the seriousness of the crime and the other factors that we discussed at sidebar, as well as the fact that the plea agreement also provides a substantial benefit to the defendant.

One of the crimes that was charged within the indictment would have resulted, upon conviction, in the automatic criminal denaturalization of the defendant.  And based on the plea, he will not be automatically criminally

denaturalized.  He may face civil denaturalization, but, nonetheless, that's a pretty extraordinary benefit that he's already received within this case.

This is a serious crime.  The defendant, for not just a one-time event but for a number of years, engaged in trade-based money laundering, and what that means is that it goes beyond just the counterfeit goods that were mentioned by the defense, which they well may be just a small percentage of his business.

The larger business, though, was really about trade-based money laundering, and that involves legitimate goods that are used to hide the source of funds.  And the area of the world that the defendant worked in, the tri-boarder area of South America, where Paraguay, Brazil, Argentina come together, is a very notorious area.  In fact, the United States trade representative for the last 15 years has put out a report every year saying of all the areas of the world, these are the few areas that are the worst offenders in terms of money laundering and counterfeit goods, and that area has been on that list repeatedly for every year, and for good reason.

The defendant was put on notice from the very beginning when he engaged in the trade there that the people were trying to hide the source of the money, and he enabled it. From 2014, you can see in the factual proffer he was discussing with people about how to hide cash for people who wanted to

either hide it from Uncle Sam or hide the ultimate source of the money.  When someone asked him about it, he was willing to enable that, and with that same person a couple years later, they asked for over $10,000 in cash, if he had that available.

There were other instances in which cash was deposited into his account.  On one occasion in 2016 three different cash deposits were made, and then he inquired about the source of it and was told that, basically, there was a person there within South America who was responsible for it, and he continued to engage in business with them.

This happened again in 2017.  He had wire transfers from all over the world that had nothing to do with actually selling these products.  He got money from Hong Kong, he got money from London, he got money from within the United States from, I think, a construction company that he said, you know this is going to look bad; basically, that I don't deal with these people in the United States, this is going to be found out.

Banks made multiple inquiries to him telling him there is no backup for these wires, these wires have nothing to do with your business, and, in fact, he had conversations with his co-defendants about what was going to happen with this scrutiny from the banks, and they decided to proceed anyway.  They talked about money coming in from Hong Kong that was flowing in, and they said what should we do, money is tight, and

there's going to be problems, but we should go forward anyway; the amounts are so large we have to figure out a way.

His co-conspirators in South America told him that he would pay, quote, in "cambio," which is the third party money transfers, so that, quote, "I leave in touch, no record of who is ultimately behind these transfers." This is a way to, basically, move illicit funds all around the world.

The defendant was intelligent enough to know this, and he proceeded with it, and in a way he took affirmative actions to help facilitate it. When counterfeit goods were stopped by customs, not only did the co-conspirators switch up who the supplier was, they changed the name from one company to another to evade detection, but he did the same thing. He approached an employee of his who owned a defunct company and used it to get money and operate it as a shell company, simply pass through money. Hundreds of thousands of dollars would come in and go out. And he discussed this with his co-conspirators, that this was a way to hide his involvement.

And they helped him with it. When he received $100,000 for his apartment, he says it was a loan, but the messages also show that he wanted to hide who is behind that. They discuss how should we account for this, and he said I can find a way so that you -- that your name is not on it and it looks like it just came from me.

This continued from 2015 through really the time of

his arrest.  We saw recent messages from 2018 where he's discussing getting cash that someone dropped off to be sent to Lebanon through Bitcoin, and they talked about how this was so that money wouldn't flow through the normal currency channels. So all of this is classic money laundering and is serious.

We don't say that the defendant is a bad person, but he did enable bad things to happen, and because of that we cannot agree to a sentence of no I am imprisonment, and the 47 months is closer to the appropriate number in this case.

MR. WEINER:  Would your Honor allow me to respond very briefly?

THE COURT:  Briefly.

MR. WEINER:  I will be brief.  Judge, sometimes prosecutors and defense lawyers look at life and business a little differently.  So I just want to explain something because I was always taught by good lawyers and good judges don't assume anything.  So I don't assume that your Honor is an expert in cambios, but here is all I wanted to tell you.

What Mr. Thakur says is true.  This area that borders three countries sells millions and millions, maybe billions, of dollars worth of electronics, but because of the banking system and the restrictions on depending on who is a citizen, where they can open bank accounts, cambios, money laundering, or, according to the government, banks, but according to everybody else in the world cambios are on every corner in Colombia in

all of these countries.

When I visited Colombia to meet with clients, I needed Colombian money.  You walk into a cambio.  They have big signs, they have beautiful lobbies, they are real, live places that compete with banks.

So while the government is correct when they say that our client got money from London or from Hong Kong, it's true, but here is what happens.  Our client sells the PlayStations, the Xboxes, and of courses he's got to be paid for it.  So what happens is the people down there do business with the cambios, because, as we said in our sentencing memorandum, they save a significant amount of money and avoid the bank restrictions.  So what they do is they go to a cambio, they pay the money, and say this money needs to go, for example, to Ali Kassir's company, Imex.

The cambios do business all over the world.  So if, in fact, there is money that's owed to the cambio in Paraguay, in London, the London cambio forwards it to Ali Kassir.

And something that Mr. Thakur forgot to mention was all of this is on record.  These are not secret, little cash payments.  They all go into banks, bank accounts that have his name on it.  He wasn't hiding anything.

So while i understand that these wonderful agents and Mr. Thakur are looking to stop bad people from laundering money, the pressure to do business and to get paid for these

PlayStations and Xboxes causes many legitimate people to say, yeah, the money comes from a cambio, it's all of record, which is how the government has made their case, it all goes into a bank account under the defendant's personal or corporate name. Hey, he is not hiding anything, he doesn't know where it comes from.

So could it be dirty money that's deposited by some? Sure.  I am sure it can, just like in any bank.  But bills of dollars are dumped through cambios which doesn't make it inherently evil or bad, even though the government says, well, gee whiz, you are put on notice that this is a bad area.  Well, it's a bad area unless you go there and you see hundreds of stores with all sorts of tourists in beautiful stores buying goods.  So i wanted to mention that.

Our client has no control over where the money came in from the cambios.  So did he accept the money?  Yes, he did. Did he have to pay Sony and Microsoft and Proctor & Gamble? Yes, he did.  And that's where the money came from.

So we can look at innocent acts, and our client did plead guilty to certain crimes, but accepting money from a cambio is not criminal in and of itself.

And i also want you to know that it's not in dispute that our client checked with OFAC, on the OFAC list, before he did business with anyone.  So when the government is suspicious of everybody in that area, our client did all that a human can

do, and that is check with OFAC.  If you are not on the OFAC list and you have a big, beautiful business and a big, beautiful office, and you are dealing in millions of dollars in electronics, hey, why not, seems okay.  His mistake was the counterfeit.  No question.  And believe me, he regrets it every minute.  Thank you.

THE COURT:  For the record, counsel, does your client wish to address the court?

MR. WEINER:  He does not, your Honor.  He feels we have said what needs to be said, as did he in his letter which resulted in the three point downward departure or downward variance for acceptance.

THE COURT:  I'd ask the defendant to stand.

After a review of the record and argument of counsel including the record discussed at sidebar, I will be sentencing this defendant outside the advisory guideline range.

It is the judgment of the court the defendant is hereby committed to the Bureau of Prisons for a term of 24 months as to Counts 4 and 12, all such terms to run concurrently.

Upon release from imprisonment he is placed on supervised release for a term of two years.  He is to abide by the standard conditions of supervised release and the special conditions as outlined in Part F and pay the special assessment of $200 -- that's $100 as to each of the counts of

conviction -- and forfeit right, title, and interest in property consistent with the plea agreement in this case.

Consistent with our discussions in this case, I will allow the defendant to report to his designated institution no later than September 6th.  September 6th.  He remains on bond in connection with this matter.

If he fails to abide by the terms and conditions of his release, he may be arrested and be serving his sentence immediately.

Anything further on behalf of the United States?

MR. THAKUR:  No, your Honor.  At this time we dismiss the remaining counts.

THE COURT:  Remaining counts are dismissed.

Sir, I am reminding you that you remain on bond in connection with this matter.  If you have any questions concerning your bond, you should discuss them with your attorneys or your Pretrial Services officer immediately.  Do you understand that?

THE DEFENDANT:  Yes, I do, your Honor.

THE COURT:  Because you are already sentenced there will be no need for a hearing.  You may be arrested and begin serving your sentence immediately.  Do you understand that?

THE DEFENDANT:  Yes, your Honor.

MR. WEINER:  One more thing.  Mr. Thakur was kind enough not to object to a recommendation for a camp close to

Miami.  Or in Miami, and we respectfully ask that that be included in your judgment.

THE COURT:  I will include that, but I am certain you explained to your client that despite the cooperation that you have with the United States and Mr. Thakur's good offices, we don't often get the facility recommended by the court.  But I will make that recommendation.

MR. WEINER:  Thank you.

THE COURT:  Anything else.

MR. WEINER:  Nothing further.

MS. NAHRA:  Thank you, your Honor.

MR. THAKUR:  Thank you.

THE COURT:  Court is adjourned.

(Proceedings concluded at 3:53 p.m.)


C E R T I F I C A T E


I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.


June 26, 2019                    /s/ Jill M. Felicetti
                                 Jill M. Felicetti, RPR, CRR, CSR
                                 Official Court Reporter
                                 400 N. Miami Avenue, Suite 08S27
                                 Miami, Florida 33128
                                 jill_felicetti@flsd.uscourts.gov